Good afternoon, your honors. May it please the court. My name is Jeffrey Robbins for defendants appellants, and I'd like to reserve four minutes. This court should on the record that was before the district court, vacate the district court's temporary restraining order, provisional class certification, preliminary injunction, and resulting bail orders that direct the release of over 100 immigration detainees. The government has three separate trying to clarify where we are. Are you contesting essentially only the authority to issue the bail order? I can't hear your question. Are you contesting only the bail order? That is my understanding that you're not contesting the part of the original preliminary injunction that essentially locked in place the then existing conditions. Is that right? That's not fully correct, your honor. The thrust of the government's argument. If you were contesting that, then it would be moot because there's a new injunction with regard to the actual conditions in the facilities. So what would be the pertinence of that earlier preliminary injunction as to the conditions in the facilities? I agree, your honor. The government does have concerns and questions about how the court exercises discretion with regard to that original preliminary injunction and the findings on which it was based on. Those could be instructive, but yes, there are subsequent preliminary injunctions that may also come before this court. And on that basis, it has to do with the releases of certain number of prisoners in order to bring down the number of bodies at the facilities. Is that accurate as to what's before us? Yes, your honor. And the corresponding class certification, I would add to that. And your honor, those bail orders, that process and the corresponding class certification should be vacated. The district court lacked the authority to release the detainees on it. It was the very first relief that the district court ordered. It didn't consider other efforts or tasks that could be taken. Those orders, those releases continued even after the district court's findings regarding the likely adequacy of the conditions at the two facilities recognized in the court's preliminary injunction order. And that process and those Excuse me, counsel. I'm really trying to break down. You've got a lot packed in there, and I'm trying to break down what you're arguing, really. It sounds like you're not arguing, or are you? That the court had authority to take any action. After Gordon, after Roman, are you contesting that the court had what it needed to take to enter any injunctive relief, or are we just going to talk about the type of relief entered? Your honor, I apologize if I'm not precisely answering your question, but the government does contend with regard to the bail orders that the district court lacked the authority to enter those orders that were released on bail. Hold on, hold on. I really have to break this down. The court did a couple of things. In the TRO, the court set up a system, right, for entering bail orders. Are you contesting that it had the authority to do that, sir? The government contests that, but recognizes the effect of the second Roman order finding that jurisdiction would be lacking over that portion of such an order. So the government's challenging. That case didn't have existing bail orders. Go ahead, Judge Berzon. You're not challenging the TRO because that's all it was. The government in its briefing and in its notice of appeal does challenge the TRO because it does have and meet the functions of preliminary injunctive relief, but what we have here before. I thought you're challenging it. I understand that, but now you say that you understand that Roman says there's no jurisdiction over it. Over the process, but if we tie the process to the over 100 bail orders, that is the key point to address today. All right, so that is the bail orders that resulted from the TRO, which we're considering as a preliminary injunction, but not the setting up of the process itself. So I don't know if that helps Judge Kristen or where else she wants to go. But we're getting there, I think. Thank you, Judge Berzon. Go ahead, Counsel. Yes, Your Honor. And so focusing on those bail orders, the district court lacked the authority to enter those individual bail orders. So putting the propriety of the process aside for the moment, the district court didn't have the authority to enter those individual bail orders. And this court has jurisdiction to review those individual bail orders. Let me, I know this sounds like a one-horse party, but another thing that you're not challenging is any of the particular, any of the specific orders on the merits. You're not saying that you're only challenging each order as beyond the court's authority in general, but not because at any particular point there was overcrowding that required the order to be issued, or that the people to whom the orders were issued met the criteria that the judge stated. None of that. Just the authority to do it at all. Is that right? In part, Your Honor, it is the authority to do it at all, but the government maintains that in challenging that authority, it is also challenging each individual order to the extent that the district court has made a finding. I understand that. Okay. So the question of jurisdiction we think is clear, Your Honor, that these individual orders should be construed as injunctive relief for which there is jurisdiction under 8 U.S.C. 1292-A1. Counsel, for my part, it would be helpful if you would assume that we're going to review them so we can get to your argument. I'm interested in Gordon. You said that you think the court couldn't enter this injunctive relief, the bail system and the bail orders. I'm going to treat those as one, as inextricably intertwined for purposes of these questions, just hypothetically. All right. So I'm trying to figure out if you think that the court lacked the authority to release prisoners because the constitutional violation, or is your contention that the error was that the court went, as I think you started to say, that the first thing the court did was go straight to thinning the overcrowding situation by releasing prisoners? The answer is yes to both, Your Honor. So why didn't the court have what it needed to find the constitutional violation, likelihood of success of the constitutional showing after Gordon and after Roman? What was lacking, please? So the record is exceptionally different from those cases, and we believe that, and we would acknowledge that an abuse of discretion standard would apply to this portion of the court's analysis, but that on a finding in a facility where there were no confirmed cases of COVID-19 at the time of the bail order process or the preliminary injunction that continued that process, the fact that there had been a reduction of half of the maximum capacity of the facilities and significant modifications, and the district court acknowledged all of these things. The district court went so far to say that it appears possible that those conditions have reached or are approaching the constitution. These COVID cases are, like Roman, there's another argument on a panel that I was on last month in Freyheit, where they're all completely moving targets, and the judgments, the junctures are being attacked because the record at the time they were issued didn't show sufficient disaster, only risk, but as it turned out, the risk was completely borne out and there was a disaster, and so what are we supposed to do? We're supposed to shudder our eyes to the fact that if these 100 or so people hadn't been released, there would have been 100 more people in the facility, and there would have been 100 more people who got serious COVID cases perhaps, or more, even more, because there would have been more overcrowding. In other words, there's something very disconcerting about faulting the district judge for looking at risks and making projections on when there hadn't yet been proven COVID cases, especially because, as it turned out here, the reason there were proven COVID cases is because they wouldn't test people, at least arguably, and they wouldn't test people, and that could well be the reason they didn't have cases. In any event, the point is that the judge has to be able to take into account the risk in light of the science and not the fact that there wasn't any case yet, and we know that because it happened. Yes, Your Honor, and with regard to... I would say this, Your Honor. The reason why the district court got it wrong here, notwithstanding what ultimately happened at these two facilities and how the court has subsequently addressed that, is that the ultimate standard for the district court to consider is one of whether the government in overseeing the operations of these two facilities exercise reckless disregard with to the risks of COVID-19, and it's critical and important to look at not what we know now, which is incredibly unfortunate, but to look at what the record and what the science said at the time that the district court entered the preliminary... Exactly. Counsel, if I could, forgive me for interrupting. There's a little bit of a delay on my end for some reason today, so forgive me if I'm interrupting you. I thought you were done, but to your point, the court found... Let's say we do look at just what he knew on the day he entered his preliminary injunction please. What he found was it was a tinderbox, so there weren't confirmed cases. I think that's right. On the other hand, if this were literally a fire code violation, we would not require that the prison has to catch on fire before a district court judge enters an order requiring compliance, because people are entitled to a minimum of safety. What's wrong with this order being entered, an order? Forget scope of it for a minute. What's wrong with him acting at a time where he could say, this is a tinderbox? Your Honor, the order doesn't pay due deference to two things. One, it doesn't pay due deference to the Centers for Disease Control guidelines regarding detention facilities at that time, and the government's efforts to meet those standards, which I acknowledge are at odds with what the plaintiff's experts suggested was appropriate, but where there is or where there are disparate recommendations or disparate views on how to approach a scenario like this, the government believes that that fails to meet the necessary findings to show deliberate indifference, to show that reckless disregard. What do we do with the fact, counsel, that at the TRO stage, the district court, it was of the impression, he's a fact finder, he's of the impression that he had really had to drag ICE across the finish line. There had been a lot of resistance, I'm paraphrasing. So he'd had eight status conferences by the time he got to the preliminary injunction hearing, and at that point he was willing to say, there's been a lot of improvements here, you've mentioned many of them in your briefing. So what do we do about that point where he said, we might be approaching a constitutionally permissible level here, but he did two things at the preliminary injunction. He ordered that the status quo be maintained, so there wasn't any backsliding, and then he went ahead and continued to enter bail orders, and those seem to me to be two very different things. Would you like to speak to that? Yes, your honor, and just to address the deliberative difference, one final point on it, the district court also really did consider the efforts the government was taking, but this, as the court has acknowledged, is the entire COVID scenario, and everyone's response to it has been something that is evolving and rapidly developing, and so that should not be a ground to continue injunction against the government. But to talk specifically about the bail orders, first, the government would argue that habeas isn't available to challenge what is the conditions of confinement claim, and the district court characterized it as that in his orders. He noted that the plaintiffs were not seeking that any particular person should be released. Counsel, Mr. Robbins, can I interrupt you, please? So, your briefing sets forth your argument that this is not appropriately brought as a habeas case because it's challenging conditions of confinement, but I read the plaintiff's brief to say that, well, it doesn't matter in any event because the court of jurisdiction is entering injunctive relief and remedying a constitutional violation of injunctive relief. So, that would not be habeas relief, but it would be injunctive relief within the court of jurisdiction. So, my concern is, assuming that the plaintiffs are going to prevail and demonstrate a constitutional violation based on the conditions of the facilities, the conditions of confinement, and assuming that they cannot seek habeas relief for conditions of confinement, but they can seek injunctive relief, what are the limits, if any, on the injunctive relief that can be entered? So, it's an odd mix between habeas, which would normally be the route to secure release. Conditions of confinement claims typically either obtain damages, if it's a bit of a claim, or a change in conditions. So, here, I think in contrast to Roman, the court ordered the actual release of specific individuals versus reduce the numbers. Reduce the numbers means a lot of things. Don't bring in new people, transfer people out, remove people, release people. It could be done in a number of ways that was not specified in Roman. But here, it was a very specific relief, even for people who are statutorily mandated to be detained. So, for me, that raises some serious issues about what, if any, limits are there on the scope of injunctive relief that a district court can order, even assuming a constitutional violation for conditions of confinement. And how do you respond? Thank you, your honor. And the government's response is that release on bail is not an appropriate remedy in response to conditions of confinement claim. We believe that that call from... More specific. Release is not an appropriate remedy. At some point, you seem to say, well, it was okay to bring down the numbers, but they had to do it by just giving us a number and letting us do it. Is that what you're arguing? That is not our argument. We acknowledge that is what the Roman decision in granting a population reduction order in the face of the conditions of confinement claim allows. But that is not what happened here. The court considered hundreds of individual bail requests and then granted, I believe, 138 of them. So, that is not specifically... Related real world question. Okay. Let's suppose we decided that he couldn't do that. Meanwhile, at the time, meanwhile, again, the world has moved on and we know that the actual configuration of this... I'm concentrating on the private facility, is such that it was possible to isolate people when they got sick and it turned out to be a complete disaster. So, even if the place wasn't... If people theoretically, by sleeping toe to heel and so on, as the judge said later, they were still too close and besides which you couldn't isolate people and you couldn't and so on. So, now we're... It's now today and if we reverse all these bail orders, what? You're going to go find the same people and put them back in the same place? No, not necessarily, your honor. It's ultimately for the government to look at the conditions in the facility, to look at who the priorities... Now an injunction based on a much broader record with regard to what can happen in this facility. And if you start trying to put these people back, presumably the district court, there'll be hearings before the district court as to whether that itself is a violation of the new injunction. And that would be a question, your honor, but the question of how the government managed the facility, who it chooses to re-detain and how it does so, that should be something that is left to the government to determine. And so, whether that requires some individuals who are at the facility to be released, for them to re-detain others, for them to re-detain individuals who haven't been released at other facilities than Mesa Verde or Dupa County, they should have the authority to do that because... Finally, we haven't really mentioned one other thing, which is that the district court found to some degree at the point of this flaring injunction, and more resoundingly later, that the people who were making the decisions for ICE, including private entity, were lying to him, told him things that weren't true, were not making any effort to deal with this. In terms of your, you know, you ought to be deferring to the government. Hasn't the government in this record kind of lost the authority to be deferred to, given the fact that they were telling, they were making statements about things that were happening in this, for example, the fact that they were isolating people when they came in and then retracted that and said, oh, sorry, we lied. It wasn't true. They weren't isolating people. And similarly, with regard to the fact that they were using a facility for a few women, a chunk of the women who were released during the periods or 12 people, as I understand it, were the women who are in this, a few women who were in a dormitory for 100 people and getting them out. And this is a very good example. It wasn't a question of getting them out for their own sake. It was a question of getting them out to free up that facility so that there could be isolation facilities and ways to separate people. So was that decision beyond the judge's authority? The answer to your question is yes. I see I'm out of time, but I do have two points in response. Your Honor, if I may just respond with two points to that question. The first is the government does this. I'm sorry. What is whether the history of the judge's determination that these particular people, leave out ISIS as a whole and not to be trusted, has no role in our determination as to the viability of his orders. And secondly, is whether the example of the fact that these, that some of the people released, released, well, all of them, not for their own sake, as I understand it, but to make the facility less corrupt. Yes, Your Honor. And the answer to the first question is no. The panel should not be considering those findings. The government objects and disputes those findings. The one piece, the one question that is before, that was before the record of the district court in the orders that are now before this court, was the accuracy of the declaration that stated that the government was engaging in 14-day quarantine and isolation for all incoming detainees. When in fact, that was corrected when brought to the government's attention to clarify that it was for symptomatic detainees. In litigation that's moving at a fast pace, things like that sometimes happen, Your Honor. We don't believe it's valid to disparage the intent and the efforts of the government based on things like that. The subsequent events are things that the government has disputed and is determining how to continue to address, but those aren't on the record in the orders before this court. The second question in terms of the examples of releases, the government has in this case coordinated the release of individuals on its own. And simply the question of prioritizing who should be released and how they should release, that is something that should remain within the discretion of the government. And the fact that the government is, in this case, has had to negotiate and interact with both the court and opposing counsel to address their arguments and I think what's happened here is simply the result of having many different people with many different points of view and many different questions and trying to address that all at the same time, Your Honor. I'd like to ask one last question to think about. And that is, is there any possibility that sending this case to our very competent mediation people for some global solutions so we don't have these moving targets and there are two more cases now or one work is pending and maybe another one to come. And so whatever we do here, it's not going to be at all the end of the story. One would think maybe there is some way to work out an assignment with an agreement as to both the conditions and the discharges. Um, I don't want you to answer that now. You can answer it when you come back. Yes, Your Honor. Thank you. Good afternoon, Your Honors. May it please the court, Brie Burnwanger on behalf of the Appellees. Um, I want to open by addressing the core constitutional issues here and responding to some of what Mr. Robbins has put forward. I think first it's really important to make sure that we're clear on what the test is here. Um, the, our clients, the plaintiffs in this case have a constitutional right to reasonable safety and custody. And what that means under Castro, under Gordon is that when the defendants make an intentional decision with regard to the conditions under which the plaintiffs are confined, it puts the plaintiffs at risk, at a substantial risk of suffering serious harm and defendants fail to take reasonable measures to abate that risk. Despite the fact that a reasonable officer would have appreciated the high degree of risk involved, defendants have violated plaintiffs' constitutional rights. Counsel, I'm with you. We all know that. Okay. And that's why there's a, the court is describing this as a, as a tinderbox situation. But the problem you've got, I think, is it was a very different situation. The court acknowledges that between the TRO and the preliminary injunction. So could you fast forward to the preliminary injunction? Cause I'm not going to give you much pushback today about the TRO. And, and, and the, and the problem I think you've got, which I'd really appreciate hearing from you about is, is sort of related to what I think Judge Beatty was trying to ask. And I think we veered off from her very helpful question. I think that the court had authority to act here if he did, because there was a constitutional violation because, because, because the winter standard was met, right? For purposes of injunctive relief of showing that the plaintiffs were going to be able to show that. Okay. If that's right, if that's, if that's where the court's authority to, to enact any order, any injunctive relief comes from, then by the time you get to the preliminary injunction stage, and he's making a finding, the district court's making a finding of, we might be to the place where the constitutional threshold is met. At that point, does the court have authority to do anything more? For your honor. So I think first I, I want to address the first piece of your question, which I think was, look at the difference between the TRO and the preliminary injunction. And just to very quickly respond. Well, my premise is the court had looked, and I'm just going from what the court said. And the court said, there's a lot of improvement that's been made. And he included the, looking at the May 27th FAM declaration, as you know. So I'm just saying that that's, that was the court's impression, right? And then he said it didn't matter. It didn't change that he was willing to go forward and enter injunctive relief. So could you speak to that? Sure. So I think first it's important to note that the district court found conditions were approaching the constitutional minimum and recognized that the change was completely due to the court's intervention. And I think as your honor mentioned to really the dragging ICE, despite a lot of resistance to really taking a look at any of its policies at all. So ICE makes effort to take credit for those changes, but ultimately the minimal social distancing that was achieved by the time of the preliminary injunction was completely as a result of the temporary release orders that the court issued. Court made specific findings that there was a cognizable danger of recurrent violation here. Even if the conditions had reached the constitutional minimum, which is not exactly what the court held. The court held that they had improved because of the court's intervention, but that they were hardly ideal. And he did two things. If you look at ER 15 and ER 18, you're referring to just one of the two points in the record. You're prescient in noting the one place I was going to look, but there's another one too. A little later where he says the improved conditions, quote, do nothing to disturb the conclusion that interim relief is necessary. I don't know how that can be right. It is right under this court's precedent in Laerdal, which recognizes that where there's a cognizable danger of recurrent violation, injunctive relief is still appropriate as your honor said. Okay, hold on right there. Forgive me for interrupting, but if you could break it down, that's what I was trying to get opposing counsel to do. He did two things at the preliminary injunction, right? One was to maintain the status quo, no backsliding. That's what you're speaking to right now. He also went forward and entered more bail orders. How was their authority? Where did the authority to do that come from? I think that comes from the fact that the conditions had not yet reached the constitutional minimum. I mean, that had been plaintiff's position at the stage of the preliminary injunction. The expert testimony that defendants didn't rebut described that there still wasn't social distancing in all of the dorms despite the reduced population. And then I think you have to look at what happens during the period of those subsequent bail orders. And this is something that's kind of, I think, difficult for the court to do because as your honors noticed, the government didn't make any challenges to the application of the standard and the release orders to the actual releases. But what's going on during the period after the preliminary injunction is that we are seeing conditions deteriorate. And so we have this first period. We've got a series of releases that were ordered in June and July at this point where we know the court found conditions were approaching the constitutional minimum, but the court did not make a fine. Well, he said he said approaching the constitutional minimum, at least for people who are the most dangerous detainees. And that's conflating two different standards entirely. You know, my premise is there's either a constitutionally adequate condition of confinement or there is not. And it doesn't depend upon how dangerous an inmate is or a detainee is. Right. The dangerousness and flight risk have to do with which ones we might let out if we if we find the constitutional conditions. Forgive me, but the conditions of confinement are unconstitutional. And so conflating those two inquiries for me is not helpful. Well, I think it's also, you know, the district court also didn't set an exact, you know, didn't rejected the plaintiff's request that it set a population cap and included in that maintaining the status quo really offered defendants flexibility to potentially increase the population if it found creative ways to use the space, you know, using its sort of discretion as as as the person running this detention center or the entity running this detention center. So I think the continuation of the bail process really has to be seen in the context of refusing to set a population cap, recognizing that defendants could increase the population and continuing to monitor and review the risk of conditions of confinement posed to a particular person and the other equities involved in the applications. So I think you. Oh, forgive me for interrupting. We have questions about the notion that there is. A unitary safety. I thought that the safety requirement is essentially a reasonable one such that. If people. If certain detainees cannot be released because they're a danger to the community or the detention is otherwise necessary, then even if there is a risk that would not be acceptable for people without those characteristics, it still can be a constitutionally valid facility. Is that not right? And in other words, doesn't the reasonableness safety standard build in a consideration of what's possible? I think I think what your honor is referencing here is the the the defendants have to take reasonable available measures. And so if a measure isn't available, then it might not apply. But when we look at the class and as the district court looked at the class, it was clear that blanket detention of the class was violating everyone's rights. That was at the TRO stage. That's true. So maybe maybe I'm ultimately missing your question. And if that's if that's the case, I respectfully ask you to clarify it. But I think what the district court is doing here is looking at the measures that are available, which include, of course, releasing people who present extraordinary circumstances, who have high risk of medical harm and who are taking into account the potential risk that they pose to the community and the potential risk of flight. For example, you had a facility full of people who pose a same. Would limiting the number of people in the facility by releasing some of them still be a viable or necessary response to the constitutional violation? In other words, with the people who are left in the facility that have those characteristics. He's subject to unconstitutional conditions at the facility if there's no way to make him safer without releasing. You know, those aren't the facts that we have here, your honor. And I think I would say that in a case like that, you'd have to look at what other measures might be available to reduce the risk in this case, finding the constitutional. Reckless disregard of safety or whatever the standard is, the fact that the characteristics of the change are part of that consideration as to whether it's unconstitutional. It seems to me not simply so that by saying that it might be constitutional as to the people who pose a significant danger or otherwise should not be released. He's not saying that it's constitutional. You can do that because as to those people, there might be a heightened degree of risk that you can expect them to take given the fact that there isn't an option of releasing them. I think that he's saying something different here, which is that, you know, in this case where you have people who the district court judge determined did pose a danger and people who didn't, that it's incumbent on the district court to protect those people who can't be released by offering them the remedy of reasonable safety within detention. So when the first cut was made, did the district court sort out the people in the whole population that were subject to mandatory detention by the statute and start with the people who were not? So what the district court did was take into account the detention statute, but really, and this is something that the government acknowledged in one of the early, I believe it was in the TRO hearing, that there were people subject to mandatory detention who didn't have any criminal history. And so what the district court did is take the detention statute into account, but really look behind the statute at the government's interest that it serves. And those government interests are preventing flight risk and preventing danger. Counsel, isn't the answer to my question? No, I've been through the bail applications and they were not sorted into two different piles. I don't see that in these bail applications. They were sorted by sort of priorities. So in the first set of bail applications, the district court permitted applications only on behalf of people with no or very minimal criminal history, serious medical vulnerabilities, or women. I'm asking a different question, which has to do with the number of folks in this population, the number of detainees who are subject to detention pursuant to the immigration statutes. I do not think they were sorted that way. They were not. You're right, Your Honor. They were not. I just want to ask one more question so we can get to Judge Beatty's question about where the authority would end to enter injunctive relief. I really want to hear your answer to Judge Beatty's question, but if you can go back to the front end first, please. As of the day the preliminary injunction was entered, was the court required to find reckless disregard? I think reckless disregard is an articulation of the CASTRO standard that we've just discussed. So does that mean yes, as of that day, to have authority to enter injunctive relief, it was required that that be met? That the conditions on that day amount to reckless disregard. Is that the question? I'm sorry, Your Honor. You don't have to apologize. That's what I'm asking. Doesn't that standard have to have been met as of the time the court entered injunctive relief at the preliminary injunction level? Under Laerdal, it does not because there's a cognizable danger of recurrent violation after that reckless disregard has been found. But then you have to get to Judge Beatty's question of where does it end? And I actually have a question before that, an even more preliminary question. To me, there's a little bit of a conflict in some of the things that are in your briefs about the nature of your claims. It seems to me that the vast majority of the statements in your briefs say that this is a conditions of confinement claim. That it's unconstitutional because of the crowding, the lack of sanitation and hygiene, et cetera, putting people at unreasonable risk of injury because they can be infected with COVID. So it seems to me almost entirely you focus on conditions of confinement as opposed to the fact of the duration of confinement. Am I right? Is this a conditions of confinement case? Or are you also saying that you're challenging the fact and the duration of confinement? We, what we are saying is that this is a really, this is the part of a really narrow set of cases in which the conditions of confinement that cause the risk of harm are the fact of confinement. So that's not, that's not really an answer because the fact of confinement is a challenge to the conviction, to the government entity holding a person, you know, this is habeas. This is the core habeas concept that you give up the body. It's not constitutional. You don't have a valid conviction. The sentence is unconstitutionally infirm. And so you can't have them in detention at all. And I don't see any argument whatsoever in any of your briefs that the government took these people into detention in violation of any statute or the constitution, which to me is a challenge to the fact of detention. I mean, do you agree? Your Honor, you're right. We do not challenge the premise of detention, but. Okay. So this is a conditions of confinement claim. What I would do is I would look at the standard in Nettles for what a fact of confinement claim is because what Nettles offers us, and I think this is what your Honor is referencing and grappling with is the holding in Nettles that says that a conditions of confinement claim citing Crawford is not proper in habeas, but a factor duration claim is. And Nettles offers us a test. Why do you care about this? I don't really understand it. Well, I mean, the point is, you know, we've got this intersection of a potential habeas claim and a claim for injunctive relief. You've pled both. We could just say, well, we don't have to reach it like the Roman court did because you have a jurisdiction for injunctive relief. And the government, I believe, acknowledges that. And so we could set aside the habeas claim. But the significance of setting aside habeas is habeas is the method to have a release for a court to order the release of a person. And so this leads to my question that I asked the government attorney. What are what, if any, limits are applicable to a court's injunctive relief to the remedies that a court can order under injunctive relief? Can the court release a specific release of individuals or should it be like Platha and or changing the conditions? And that may end up being meaning the release of people. But the court doesn't specifically order the release of various detainees. That's where I really struggle with what happened here. I think there's jurisdiction. I think you you're likely to prevail under the winter standard for a constitutional violation. But the problem is the district judge then started entering orders to release specific individuals, but not in the context of habeas as injunctive relief. And in fact, did so violating statutory mandates. So to me, that that is problematic. I mean, but I haven't seen. And if maybe you can help me, if you can draw a line, where is there any line that we can draw on what the district court can do? Or can they do anything? I know they have broad discretion, but can they do anything, including enter relief that is contrary to statute? So I do have a couple of responses to this, Your Honor. I think first, with regard to the mandatory detention statutes and the other detention statutes that the government raises here, the government concedes, as it must, that they are subject to constitutional standards. No detention statute can override the Constitution. So in its analysis, in every individual release application, if you look at them in the injunctive context, which we're doing now, the district court took into account. I'm sorry. I'm sorry to interrupt you. I just we're getting really close to running out of time. So I think what you're saying is valid. But I think it brings us full circle back around to what the government was arguing, that a detention statute can't be unconstitutional. And there is, in fact, a section within those statutes that says that the attorney general's discretion can't be overruled by a court in 1226 E. So in any event, does that mean that before the court goes there, it's the first remedy? You know, and contrary to a mandatory detention statute, they should have done something else. You know, they should have ordered a cap or a reduction in population or something other than to start immediately releasing individual detainees. The district court considered that, and we didn't oppose it. There are some really clear reasons why it ultimately went this individual release route and didn't order a population cap or order defendants to release people. So really quickly, the district court asked the government how it would assess people for release. It asked them if they could produce a list of people. This is a TRM hearing, a list of people in custody, their underlying medical vulnerabilities and their criminal history. This is information the government had said in its declarations it already had. But at the TRM hearing, they said not only did they not have that information collected for the class, but that it would be too burdensome to produce it. So that raised real concerns with the district court that they hadn't assessed the underlying records of the class members to undertake the very inquiry that they were asking the district court to do. And I just want to also say that the release application process didn't have to exclude the government. They could have come to the table and proposed who should have been released under the very set of population reduction standard that you propose. They never did that. They opposed every single release application, even for the few people who they ultimately ended up releasing on their own without a district court order. So they took these positions that really demonstrated to the district court that they weren't undertaking this analysis that they had told the district court they were undertaking, and that they didn't have a meaningful way to undertake population reduction. What they said at the TRM hearing was, we don't know how many people, we don't know how quickly, just we'll start releasing people and see how it goes. And I think it's understandable that the district court was concerned by that and not satisfied by it. The district court could say, it doesn't have to just go, well, I'm concerned I'm going to order this specific release of people. The district court could have then responded with an order. You will have this facility to X number of people in 30 days, or you will reduce the population in 60 days or something. I mean, he could have issued different types of orders before releasing individuals, some of whom were statutory mandated to be detained. And the other problem, and this is something that's mentioned in Roman, where do you draw the line with the district court micromanaging what's happening at the facility? Here we know there was a person accused of murder who had an Interpol hold who was released and then absconded. We know that happened. So there's expertise involved in the executive in evaluating people who should be released. So I think Roman's point is well taken, that the court cannot start that level of micromanagement, which seems to have happened here with these release orders. One important thing to note about these release orders, Your Honor, is that the district court gave ICE full discretion to use the same, the intensive supervision programs that it uses every day for people who are not subject to detention, but who are subject to its supervision. Every single person released by the district court is subject to GPS monitoring, to check ins with ICE, to the same supervision that they employ in the regular course of their business. And that, as we point out in our briefs, has a 99% success rate for preventing flight. So I do think that there's actually a lot of discretion that the district court conferred on ICE and the district court imposed specific enhanced standards of release for people, depending on the concerns that ICE might have raised or what the district court found in their individual applications. So I think the conditions of release actually confer a lot of discretion on ICE and are consistent with ICE's own interests. You mean, you're not saying the bail orders gave ICE discretion. You're saying once the district court ordered the release of a specific person, then those orders, as I understand it, had certain requirements. 14-day quarantine, verified custodian, by the way, who is not a person that they live with. It's just a person who's going to say they'll be responsible for them, and perhaps location monitoring. But those are conditions for something different from release. And, you know, courts order the conditions of release all the time. The agency may make requests, but it's the court that orders that. But the difference here was the order to release people in the first place. Well, I've taken you over time. I'm sorry. Can I ask a couple of questions? One is, do we have an idea of what has happened? How many total people were released? At the time of the preliminary injunction in these challenge orders or overall? No, at the time of the challenge order. Um, I have 137. I heard Mr. Robbins say 138. Not at the time of the preliminary injunction, because there's a second appeal, which includes other people. So. Oh, excuse me. And excuse me, Your Honor. In the orders that have been appealed today, I have 137. I heard Mr. Robbins say 138. Do we know what's happened to those 137 people? We do, Your Honor. Do we know whether they're, go ahead. They're all, I'm sorry to interrupt you, Your Honor, but they are all subject to GPS location monitoring. But they are all, they're all still here and haven't been deported yet. Some have been deported. That's what I'm trying to find out. We don't know. We don't know how many people are actually left. I haven't, I will, I have not run the numbers, Your Honor. There is a requirement that I notify the plaintiff's counsel and the court when we need to custody to deport them. So we have gotten some notifications like that. I have not run the numbers, but they. Secondly, I asked Mr. Robbins and I will ask you whether there is any point to having our mediation people talk to you because the light, I mean, world has moved on and we have two more appeals coming up. We have obviously a very different level of knowledge about both the course of COVID-19 in general and how it played out in this facility and so on. So there is a sense that we are litigating ancient history here and then it might make more sense to see if the parties could sit down and discuss some answer to the overall current situation, including these people who are out of custody now. But are obviously finding some of whom have been removed and some of whom have not. So what is your view of whether at least an attempt and what we usually do is just have you have a conversation with a mediator on the top side, whether it's worth running for. We would welcome it. We have raised it with the defendants and it's something we would absolutely welcome and think is appropriate. Okay. Thank you very much. Thank you, Your Honor. Mr. Robbins, let's see. Why don't we give you five minutes because Ms. Berlanko went over, that's up to six. Thank you, Your Honor. On the question of mediation, that is something I do need to take back and we can report to the court. I think there may be openness on the question of the injunctions themselves. I am uncertain with regard to the question of the bail orders, what the government's position will be. And I will bring that back and report back to the court. The question isn't what the position will be. The question is whether you're willing to talk to a mediator about it. Yes, Your Honor. I understand the question. But even for that, that is something I will have to take back and discuss through the department and with the agency. I don't know whether my colleagues have any interest in this, but I do. Response. Yes, Your Honor. We will provide that as quickly as possible in the next day or two. In rebuttal, I wanted to pick up on one of Judge Christian's points, this being the question of the bail releases and the preliminary injunction and how that is all tied to or is not tied to the conditions at the facility. And so in looking at the preliminary injunction order and looking even at the TRO, the government's position is yet another reason why those bail orders fail is because they are not tied to the conditions of confinement. They are not tied to population reduction. The record at page 75 discusses in the TRO entering bail orders to mitigate health risks. And at the preliminary injunction, at excerpts of record 11, it talks about mitigating dangerous conditions. But I'll note. What's wrong with that? What's I don't understand. You're missing. I am missing the point. So if we look at that, the preliminary injunction, the court indicates that it will continue the bail orders and the bail process for mitigating dangerous conditions. But the court does not make any finding that that the conditions continue to be dangerous, such that additional releases will be required. Do you mean he didn't make a finding of an ongoing constitutional violation? Yes, Your Honor, and no requirement in terms of the need for a further population reduction. In fact, the court says in the preliminary injunction order that it wants to get a better understanding of the number of people that would be detained to help determine what future relief to order. And so what we have here and what what is the problem with the bail orders is the court is releasing individual on bail, which the government maintains that it lacks authority to do. But even if the court had authority to do it, that those releases aren't tied to anything at all. And if we look at the individual bail orders, there's no way for the government to ascertain how the court has exercised its judgment and discretion with regard to those bail orders, because there's no analysis. And so counsel before you, you're skipping over a really important point, if I could get you to respond. Opposing counsel answered the question. I think Judge Beatty posed it. Maybe I posed it, but doesn't matter about about why the authority was used the way it was used. And just assume for this hypothetical, please, that there's a constitutional violation, at least at the TRO level. And then the question was, why did the court go straight to releasing the overcrowding? Why didn't set set a number, a percentage and require that the agency go forward? And her response was that the agency was very recalcitrant and had not come up with the numbers and wasn't. You heard her response was was really resisting. Could you could I get your response to her response? Certainly, Your Honor. And two points in response to that. The first is the court's frustration with the fact that the government opposed every single bail order is not a valid or appropriate reason to suggest that the government is being recalcitrant. That issue in setting up this process, it required the government to address the question of whether there were extenuating or special circumstances with regard to each and every bail order in the government. That for that and other reasons was. But go to the real point. Go to the real question, if you would. Why was it wrong for the court to set up the system in the first place if it felt like he was pulling teeth? You know, we're not fact finders. And he had, as I can count, I think eight status conferences, had a lot of feedback back and forth. And the order here is unusual in expressing with great candor how frustrated the district court was. And as I said, I've given you my sort of telegraph, the punch counsel. He said it was a tinderbox. My vote is that he doesn't have to wait for the place to catch on fire. So why is it wrong that under these circumstances with this factual record, he had the ability to do something rather than just waiting for ice to act? Why is that wrong? That's wrong because the court lacked the authority to do so to release individuals on bail. So the government has discussed the factual counsel. That's the conclusion. That's the conclusion. My hypotheticals. There's a constitutional violation. Make it a hypothetical, a serious one, a fire code. We're worried that he doesn't have to wait for the place to catch on fire. And your response is, well, he doesn't have the authority ever, at no point, even if the factual record shows that ice really wasn't responding. That is the answer, Your Honor. And the specific nuance of that response is the court lacks the authority to release individuals on bail via this individualized process. Your position, and tell me if I'm wrong, it's not that it would have been OK if he had said release 100 people and you choose them. That's not your position. Under Roman, while we disagree that the record would support that, if the court made that finding and ordered that, it would be supported by Roman. So your position is that he could say that he could have said, just you have to get it down to 100 people and you choose. I thought earlier when I asked that question in Alaska, you said, no, your position was going to order anybody released. No, Your Honor, that is not my position. That's not the government's position today. OK, so if he now said, all right, you now have 130 people who've been released. I want you to keep the same numbers, you know, if you want to change the people, go ahead. That would be fine. The government still believes that would not be fine because we don't, the government's position is that the record would not support that. Or if that were to recur at this time, that would be something that would have to go back for consideration on the current circumstances, on the current state affairs. So I think, Mr. Robbins, I think what Judge Berzon is getting at is the distinction between an order to reduce the population in a facility and an order to release a specific individual. And we know that there have been orders to reduce populations that have been affirmed even by the Supreme Court. I think it's the Brown versus Plather, Plather versus Brown, I'm getting the names reversed. But there was an order to reduce the prison population, but not specific prisoners. And then the prison officials and the state had to determine how to do that, which is different from the orders here to release specific individuals. So, I mean, I think what Judge Berzon's question is, is that the government's position that the court couldn't order a reduction in the population. However, the government achieved that, expanding the facility, moving people to other facilities, releasing people, not bringing new people in, deporting people. Do you understand the point? I mean, what's the government's position on that? Yes, the court has the authority to do that. And you're quibbling with this, you're saying factually, on this record, no, we understand that. But we put it, Judge Berzon put it in the, you know, assume certain things, assume the constitutional violation. I, the court has the authority to do that. I think the constitutional violation alone, the court has the authority to do that. That is not what the court did here. And so for purposes of this appeal, the question about whether the court had the authority to release individuals on bail in violation of the statutory authority and detention requirements of the Immigration and Nationality Act, regardless of any constitutional violations found with regard to the conditions of confinement, is what was improper here. One last question, on this particular question. My understanding is that your answer to that question is based on Roman, but that the government's position in Roman still is that that isn't true either. Is that true? In other words, you're saying Roman said that, but we don't agree with it. I don't know whether it's time for filing a petition because your surrender has run in Roman and whether you're planning to do that. But your abstract position is that we're answering that based on Roman, but our actual position is you can't do that either. Is that right? That's fair. That's fair. Yes. All right. There is, your time has run by a lot and I thank both of you for your arguments in this very helpful case. If there's anything that you're dying to say in closing, Mr. Robbins, you're welcome to do it. The court has granted me sufficient indulgence. Thank you. Thank you very much. Thank you both. The basis of Peter Rivas versus Jennings is submitted and we are in recess.
judges: Berzon, Christen, Bade